WILSON *v.* STATE.

Opinion delivered July 2, 1928.

*Watkins & Pate,* for appellant.

. *H. W. Applegate,* Attorney General, and *Walter L. Pope,* Assistant, for appellee.

MEHAFFY, J. The appellant was indicted, tried and convicted for unlawfully, feloniously and carnally knowing and abusing a female under the age of 16 years. Appellant filed his motion for a new trial, which was overruled, exceptions saved, and he prosecutes this appeal to reverse the judgment of conviction.

Opal Sutton testified that she was 16 years old on March 24, 1928; that she knew W. A. Wilson; met him in December, 1927, and later, in December, met him again at Mrs. Carmack's house, and that other persons at Mrs. Carmack's went away and left her and Wilson alone. That, after they were left alone, they went back into the bedroom, and Wilson had intercourse with her; that she has had no improper relations with him since that time; that she and Wilson were in bed together from about 2 o'clock to 4 o'clock in the afternoon. She admitted that she had made statements to others that she had had no improper relations with Wilson; that she made these statements because she was scared. She testified that she had never had such relations with men before that time; before the trial she made a sworn statement that she had never had improper relations with Wilson. She had sworn in the municipal court in North Little Rock that she had such improper relations, and also had sworn to the same facts before the Pulaski County Grand Jury.

She had made the statement that her statement that she had had improper relations with Wilson was not true to a number of persons, and had signed and sworn to a written statement that Wilson had at no time ever had intercourse with her.

Her mother, A. Sutton, testified that Opal Sutton was 16 years of age on March 24, 1928; that Wilson came to her house and wanted Opal to go to a show, but she did not permit her to go. That Mrs. Carmack came to her house and begged her to let Opal go to her house, saying that they were giving a little party, and she let Opal go.

Henry Niehaus had known Opal Sutton for about four months; did not know Wilson; took Opal Sutton to Mrs. Carmack's house on Sunday.

Juanita Holland knew Opal Sutton, and knew Mrs. Carmack; had seen Opal Sutton with May Carmack.

Arlene Snow testified that she had known Wilson something more than a year; also knew Mrs. Carmack, and had been to Mrs. Carmack's house; that Wilson lived at his filling station on Park Hill, and May Carmack lived in a residence near the filling station. She had been on one of the parties; she was then at the industrial school under the care of the probation officers, and had been there since the trouble arose.

Opal Sutton was recalled, and testified that no one tried to get her to leave town; some one told her that money had been offered to take her out of town, and that she had better watch her step. That Jack Ives told her that Wilson offered him money to take Opal out of town, or marry her, or something; that she had no idea of going away with Ives; that Jack Ives was a bootlegger.

The appellant, Wilson, testified that he ran a filling station north of Park Hill, where he lived; that Opal Sutton went to the home of May Carmack, which was his former home, in December, 1927, and he was there, but that he had no improper relations with her. That May Carmack was appellant's former wife, and Jack Carmack, May's husband, and Henry Hodges were there at the time, and appellant's wife was with him. Appellant

testified at length about the house party and about being at May Carmack's; he testified positively that he had never had any improper relations with Opal Sutton. He also testified that Opal Sutton wanted to talk to him, and that he met her, and that she wanted to make it right and get right herself. That he was afraid to talk to her, and got her to go to Mr. Pate's house, and then to Mr. Pate's office next morning, and Mr. Pate was not there, but Mr. Watkins was, and the girl made this statement, and signed it and swore to it before Mr. Longstreth.

Appellant urges that the judgment of conviction should be reversed on two grounds. (1) It is insisted that the court erred in permitting certain questions to be asked appellant on cross-examination. He was asked, "You have had lots of parties at your present place?" and he answered "No." Then he was asked the question, "When did you quit?" These questions were objected to, and the court stated that it would be competent to show his habits, associations, etc. The prosecuting attorney asked him also, on cross-examination, in speaking of Arlene Snow, "Hasn't she spent the night upstairs over your filling station in your room?" Appellant objected to this question. The prosecuting attorney was then permitted to ask the same question about Catherine Johnson, and asked the appellant, "Hasn't she spent the night up there?" The court stated: "He has a right to cross-examine him and to inquire into his habits, his associations and associates. His association with young girls, and old girls, for that matter, to inquire into his past life and habits, but not as proof of this particular charge or any charge at all, but only as going to his credibility as a witness, and the jury will so regard it as only going to his credibility as a witness, and not as proof of this particular charge." The prosecuting attorney then asked appellant if he had had intercourse with Catherine Johnson, and also asked him if he had ever had intercourse with Arlene Snow. He asked the same question as to Pearl Valentine. All these questions were objected to by appellant, and the court again said:

"The jury will understand that this cross-examination only goes to the credibility of the witness, and it is to be considered for nothing else and has no bearing upon the guilt or innocence of the defendant on this charge." Prosecuting attorney was also permitted to ask appellant: "Arlene Snow and Holland, this Holland woman, all came out there?" He then asked appellant: "All three of these girls have been at your house, upstairs, upon a party, or whatever you call it?" He was also asked: "Did you ever run Wood out of the room so you could have intercourse with Pearl Valentine?" He was then asked by the prosecuting attorney: "Didn't you have him (Buddie Wood) out there selling liquor at $2 a pint?" The prosecuting attorney then asked him: "Have not you had so many parties out there that you are now under a charge of running a disorderly house?" All of these questions asked the appellant were objected to and exceptions saved, and appellant now urges that it was error to permit appellant to be asked these questions, and for that reason the case should be reversed.

It was not error to permit the prosecuting attorney to ask the witness the questions objected to. This court has said, quoting from Stephens on Evidence, "When a witness is cross-examined he may be, in addition to the questions hereinbefore referred to, asked any questions which tend, (1) to test his accuracy, veracity, or credibility; or (2) to shake his credibility by injuring his character." After the court quoted the above it continued: "We are not called to approve the rule stated so broadly, but it is always competent to interrogate a witness on cross-examination touching his present or recent residence, occupation and associations, and if, in answer to such questions, the witness discloses that he has no residence or lawful occupation, but drifts about in idleness from place to place, associating with the low and vicious, these circumstances are proper for the jury to consider in determining his credibility. That such a life tends to discredit the testimony of the witness, no one can deny; when disclosed on cross-examination, it

is exclusively for the jury to determine whether any truth can come from such source, and if so, how much. The right to impair the evidence of a witness by cross-examination must not be confounded with the right to impeach a witness by evidence introduced by the opposite party. * * * Yet it is held that, for the purpose of discrediting his testimony, the witness may be asked upon cross-examination as to specific acts." *Hollingsworth* v. *State,* 53 Ark. 387, 14 S. W. 41.

The court in this case told the jury that this testimony only went to the credibility of the witness, that it could be considered for nothing else, and that it had no bearing upon the guilt or innocence of the defendant on this charge. Under the instructions of the court, the jury could not have considered this evidence as proof of the charge against him, but they could only consider it as affecting his credibility as a witness. This court, in a recent case, quoted with approval the following:

"It has always been held that, within reasonable limits, a witness may, upon cross-examination, be very thoroughly sifted upon his character and antecedents. The court has a discretion as to how far propriety will allow this to be done in a given case, and will or should prevent any needless or wanton abuse of the power. But, within this discretion, we think a witness may be asked concerning all antecedents which are really significant, and which will explain his credibility." *Bowlin* v. *State,* 175 Ark. 1115, 1 S. W. (2d.) 553. See also *Whittaker* v. *State,* 171 Ark. 762, 286 S. W. 937; *Barton* v. *State,* 175 Ark. 120, 298 S. W. 937; *Garrison* v. *State,* 148 Ark. 370, 230 S. W. 4.

This court has uniformly held that a defendant, on cross-examination, may be asked questions which affect his credibility as a witness, and that it is not improper to do so, although the questions may be about specific acts. Of course it is proper for the court to tell the jury, as was done in this case, that such evidence is not proof of the charge for which he is being tried, but that

it can be considered only as affecting the credibility of the witness, and that they cannot consider it for any other purpose.

It is next insisted that the evidence is not sufficient to sustain the verdict. The court gave the following instruction to the jury: "In this case the defendant, like any other defendant charged with a crime, is presumed to be innocent. This is the presumption that begins with the commencement of a trial and continues throughout the trial, or until the evidence convinces you of his guilt beyond a reasonable doubt, and that the offense was committed in this county and State within three years next before the finding of the indictment."

The jury therefore, under the instructions of the court, could not convict the defendant unless they believed from the evidence beyond a reasonable doubt that he was guilty. The prosecuting witness testified positively as to their relation, and the appellant testified positively that no such relation ever existed. The weight of the evidence and credibility of the witnesses were questions for the jury. This court does not pass upon the credibility of witnesses nor upon the weight of the evidence. If there is competent evidence of a substantial character, the verdict of the jury is controlling here. The testimony of the prosecuting witness was sufficient to warrant a conviction. "It is well settled in this State that, in the prosecution for carnally knowing a female under 16 years of age, a conviction may be had upon the uncorroborated testimony of the prosecutrix alone." *Seaton* v. *State*, 151 Ark. 240, 235 S. W. 794.

The judgment of the circuit court is affirmed.